IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF JASPER R.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF JASPER R., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

STEFNEE R., APPELLANT.

Filed September 9, 2025.    No. A-24-864.

Appeal from the County Court for Cheyenne County: RANDIN R. ROLAND, Judge. Affirmed.

Donald J.B. Miller, Cheyenne County Public Defender, for appellant.

Katy A. Reichert, of Holyoke, Snyder, Longoria, Reichert & Rice, P.C., L.L.O., guardian ad litem for appellant.

Amber Horn, Cheyenne County Attorney, and Audrey M. Long, guardian ad litem for minor child, for appellee.

RIEDMANN, Chief Judge, and MOORE and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Stefnee R. appeals the order of the Cheyenne County Court, sitting in its capacity as a juvenile court, terminating her parental rights to her son, Jasper R. She contends that the court abused its discretion in terminating her parental rights and that termination was not in Jasper's best interests. For the reasons set forth herein, we affirm.

- 1 -

## II. STATEMENT OF FACTS

### 1. Facts Leading to Adjudication

Stefnee is the biological mother of Jasper, who was born in May 2019. Stefnee was Jasper's sole caregiver, providing food, clothing, housing, taking Jasper to his well-baby checkups, and making sure that his immunizations were up to date. Stefnee provided for herself and Jasper with disability benefits that she had received since her birth and with income earned from part-time jobs. Stefnee had also enrolled Jasper for preschool starting on August 12, 2022. However, on that date, Stefnee was involved in a dispute with a 17-year-old neighbor over payment for babysitting. Stefnee asserted that the neighbor grabbed her by the throat and shoved her to the ground and that, in response, she pulled a knife from her pocket to defend herself. This incident occurred in front of Jasper and resulted in Stefnee being arrested and spending 11 days in jail. Because there were no other caregivers for Jasper, DHHS removed Jasper from Stefnee's care.

### 2. Adjudication

On August 16, 2022, the State filed a petition alleging that Jasper was a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). The following month, on September 15, Stefnee and the State reached an agreement in which Stefnee admitted to an amended petition which alleged that Jasper was a child within the meaning of § 43-247(3)(a) through no fault of her own. The agreement also provided that Stefnee agreed to participate in supervised visits arranged by the Department of Health and Human Services (DHHS) for 2 weeks and

> if all goes well with the interaction between [Stefnee] and [Jasper] during those visits and with [Stefnee's] anger management and coping skills, and no visits are missed, there will be a transition plan made by DHHS and [the guardian ad litem] and [Stefnee] for the reunification of Jasper with [Stefnee] in her home.

Also, as part of the agreement, Stefnee agreed to participate in a full psychiatric evaluation and follow its recommendations; complete the Circle of Security class; work with family support on her anger management and coping skills; and have Jasper participate in a developmental evaluation. Based upon this agreement, the court adjudicated Jasper as a child within the meaning of § 43-247(3)(a).

DHHS initially assessed Stefnee's case as high risk due to her arrest for pulling a knife on another individual, her past and current mental health issues, and her history of abuse as a child. Nevertheless, DHHS originally planned for Stefnee to have visits with Jasper for a few weeks and then transition Jasper back to Stefnee's care. However, due to concerns that arose, including Stefnee's anger issues and lack of medication management, Jasper was not transitioned back to Stefnee's care and has remained in out-of-home placement during the pendency of this case.

### 3. Dispositional Hearings/Goals/Reasonable Efforts

The first dispositional hearing was held in mid-October 2022. Other dispositional hearings were held in late October 2022; November 2022; January 2023; March 2023; April 2023; July 2023; September 2023; October 2023; January 2024; April 2024; and July 2024. During this case,

Stefnee's goals remained consistent and the court's orders required Stefnee to participate in a psychological evaluation and follow recommendations; sign releases for all services being used; participate in medication management and follow recommendations; develop a safety network approved by DHHS; attend family team meetings; complete the Circle of Security Class; work with family support on issues including anger management, coping skills, and parenting skills; attend visits; attend family counseling and child-parent psychotherapy (CPP) and follow recommendations; ensure that communication with Jasper was age appropriate and that Stefnee involved Jasper in only child-friendly conversations.

The record reflects that reasonable efforts provided, or offered, to the family included case management services, family team meetings, a psychological evaluation, foster care, transportation, therapy, CPP, Circle of Security parenting class, family support, and supervised visits. In the referral for visitation, DHHS requested that visitation specialists work with Stefnee on protective parenting skills, maintaining a safe and stable home, and providing healthy meals. Community support worked with Stefnee on budgeting, provided transportation to appointments, made sure Stefnee's apartment was ready for visits, and offered cleaning suggestions. Additionally, DHHS provided rent payments, utilities, gas vouchers, food vouchers, and household vouchers to Stefnee. Household vouchers could be used for non-food items such as household supplies, cleaning items, toiletries, or pet food.

### 4. APPOINTMENT OF GUARDIAN AD LITEM FOR STEFNEE

During the case, in September 2023, Jasper's guardian ad litem [GAL], with the State's consent, filed a motion requesting the appointment of a GAL for Stefnee. The motion explained that Stefnee had completed psychological testing which indicated Stefnee suffered from prolonged mental health issues; Stefnee had been participating in individual therapy and CPP; and that due to Stefnee's diagnoses and the recommendation of the CPP therapist, the appointment of a GAL for Stefnee would "help her protect her best interests and guide her during the pendency of the proceedings." Following a hearing held that same month, the court appointed a GAL for Stefnee.

### 5. MOTION FOR EXCEPTION TO FILING MOTION FOR TERMINATION OF PARENTAL RIGHTS

On December 11, 2023, Jasper's GAL, with the State's consent, filed a motion for an exception to having to file a motion for termination of parental rights, alleging that Jasper was taken into the State's custody in August 2022 and had remained in out-of-home placement since that time; that Stefnee was working on her case plan but had not had a full opportunity to avail herself of all services, particularly to complete CPP; and that DHHS had agreed to extend the initiation of termination proceedings beyond 15 months, due to the need for continuing CPP with Stefnee and Jasper. The court found that good cause existed for an exception to the State and/or the GAL filing for termination of parental rights because Stefnee was continuing to work on the case plan and had not fully had time to complete it in furtherance of the goal of reunification.

6. MOTION TO TERMINATE PARENTAL RIGHTS

On July 18, 2024, the State and Jasper's GAL jointly filed a motion to terminate Stefnee's parental rights pursuant to § 43-292(2) (continuous or repeated neglect or refusal to give necessary parental care and protection); § 43-292(3) (willful neglect); § 43-292(5) (parent unable to discharge parental responsibilities because of mental illness or deficiency and reasonable grounds to believe condition will continue for prolonged indeterminate period); § 43-292(6) (failure to correct conditions leading to adjudication despite reasonable efforts); and § 43-292(7) (out-of-home placement for 15 out of most recent 22 months). The petition also alleged that termination of Stefnee's parental rights was in Jasper's best interests.

7. TERMINATION HEARING

The termination hearing was held over 2 days in October 2024. The evidence established that Stefnee completed a psychological evaluation with Dr. Anne Talbot in October 2022; completed a co-occurring evaluation with Marcia Estrada in October 2022; completed a parenting assessment with Joan Schwan in September 2023; attended therapy; followed medication management; attended visits; regularly attended team meetings and completed the Circle of Security parenting class as ordered.

(a) Case Manager's Testimony

Jennifer Burgess was assigned as the caseworker when the case began on August 12, 2022. Burgess acknowledged that Stefnee generally complied with court orders requiring her to regularly attend monthly team meetings, maintain an apartment, obtain employment although she struggled to maintain employment, and consistently attend supervised visits. However, Burgess testified that Stefnee struggled to accept redirection from the team, often becoming angry and claiming the State was "out to get her," that "nobody saw her side of things," and that Burgess was "trying to provoke her." Burgess testified that, in addition to angry outbursts, Stefnee failed to implement skills and feedback from the team, did not take responsibility for her actions, did not understand how her actions affected Jasper, and did not follow through with the visitation plan or the numerous transition plans to achieve reunification. Burgess further expressed concerns regarding Stefnee's mental health, which included angry outbursts, paranoid ideations, and a lack of understanding about how having adult conversations in Jasper's presence could affect him in a negative way.

Throughout the pendency of the case, Stefnee's outbursts, conflicts with the team, and inability to accept redirection resulted in visitation services being unsuccessfully discharged and DHHS having to contract with five different companies for visitation service. Multiple companies declined to accept the visitation service because their workers did not feel safe around Stefnee.

At the outset of the case, Stefnee's visits were 20 hours per week and fully supervised. An attempt to allow 30 minutes of unsupervised time during visits was abandoned after 7 to 10 days due to concerns that Stefnee was not properly supervising Jasper, as evidenced by the family support worker returning to find Jasper outside without supervision and Stefnee becoming oppositional without indication of what caused her mood swings. During the case, Stefnee's visits were reduced due to Stefnee exhibiting concerning behaviors and law enforcement being called to Stefnee's visits on at least five occasions, with one visit resulting in criminal charges against

Stefnee. At the time of the termination hearing, her visits were only 4 hours per week and remained fully supervised. Burgess further admitted that Stefnee repeatedly requested more time with Jasper, but those requests were denied.

Burgess described Jasper as a social, likeable, "really smart kid" who does "really well in school." She also described him as "very in tune with the people around him" and "a great kid." Burgess stated, in the months prior to the hearing,

> Jasper has had a couple of questions about possibly going home because another foster kid within his home went home, so . . . he started to kind of bring that up the past couple of times I have met with him.

> So he's voiced worries about going home. And then . . . really the only thing he'll talk about is [asking whether Stefnee was] having a bad day. Like, he doesn't like it when [Stefnee has] a bad day.

Burgess testified that Stefnee had not made any sustainable behavioral changes during the pendency of this case, had not progressed in her parenting skills, a beneficial relationship did not exist between Stefnee and Jasper, and that it was not safe for Jasper to return to Stefnee's home.

### (b) Visitation Providers

Jasper's GAL and the State called two visitation providers: Rebecca McGuern, who supervised visits from August to December 2022, and Brittiana Shifflett, who supervised visitations from the middle of June 2024 until the termination hearing.

### (i) McGuern's Testimony

McGuern's testimony reaffirmed Burgess' testimony that during team meetings, the team discussed issues, including Stefnee's failure to take redirection, her aggressive behaviors, name-calling, and the condition of Stefnee's home which was "not well kept" and smelled of cat urine.

McGuern also acknowledged that Stefnee consistently attended visits, that Stefnee and Jasper seemed excited to see each other, and during visits that occurred at Stefnee's home, Stefnee prepared meals for Jasper and spent time with him playing. However, McGuern testified that Stefnee stated that "she was [Jasper's] parent and she would parent as she wanted to." Additionally, during visits, Stefnee called McGuern names in front of Jasper including "a bitch" and "the grinch." Although Jasper did not mimic Stefnee's name-calling, when Stefnee became "angry and show[ed] displeasure or move[d] something across the room, then . . . [Jasper] would throw things . . . and stomp." McGuern testified that, although Stefnee never became physically aggressive with her, "Stefnee always made sure that I knew that she carried a knife." Stefnee also disregarded boundaries by calling and texting McGuern "at all hours of the night."

During the approximately 4 months that McGuern supervised Stefnee and Jasper's visits, law enforcement had to be called on three separate occasions. On the first occasion, during the 30-minute unsupervised portion of Stefnee's visit, Stefnee called law enforcement over her concern that Jasper's car seat had not been properly installed. After the responding officer explained that the child car seat was properly installed, Stefnee became angry and placed Jasper in the car seat and "rattled" it.

Law enforcement was contacted a second time after McGuern ended a visit following Stefnee's disregard of a warning that the visit would end if Stefnee continued to scream and use inappropriate language. When Stefnee physically prevented McGuern and Jasper from leaving the visit, McGuern called law enforcement for assistance. McGuern testified that during this second incident, Jasper was "scared" and asked Stefnee "to stop several times."

The third time law enforcement was called to a visit was on December 25, 2022. On this date, McGuern ended the visit after Stefnee threw a piece of a floor puzzle at her, began screaming obscenities, and prevented McGuern and Jasper from leaving. On this occasion, Stefnee "was picking [Jasper] up and holding him back in one arm by his belly," which "frightened" Jasper. After this visit, McGuern's employer stopped providing family support due to safety concerns.

According to McGuern, Stefnee and Jasper cared for each other but "Jasper was the dominant person in the relationship. Whatever Jasper wanted to do is what we did for the day, wherever they wanted to go or . . . if he wanted to eat or whatever, that was all determined by Jasper." Further, Stefnee failed to consistently enforce rules or redirect Jasper. McGuern testified that she transported Jasper to and from visits, Jasper never disrespected her during the transportation to and from visits and, on the way to visits, "[h]e was usually happy-go-lucky Jasper" but after visits, "[h]e usually immediately fell asleep in [the] car . . ."

*(ii) Shifflett's Testimony*

Shifflett testified that she supervised visitations between Stefnee and Jasper from mid-June 2024 up to the termination hearing. Shifflet admitted that Stefnee did not miss any visits and that in nearly every visit, Stefnee was affectionate towards Jasper, praised him, encouraged him, planned meals, and engaged with him. However, Stefnee would not prompt or redirect Jasper when he was not listening to her. For example, Shifflet testified that sometimes the play between Stefnee and Jasper would "become rough where he starts slapping her across the face, and so we'll give her a minute, and then she won't redirect him, so then we redirect." Further, Stefnee was resistant to redirection or coaching and Stefnee's visitation hours were decreased because Stefnee called the workers names, failed to take direction or prompting, and because Stefnee and Jasper both became "physical." Shifflet testified that because of Stefnee's behaviors, her visits required two staff members.

Shifflett testified that, when she began supervising visits in June 2024, the interaction between Stefnee and Jasper was "good," but their interactions slowly became "distant. Jasper would feed off Stefnee's behaviors towards staff . . . [Jasper] would get physical [toward] objects in the office. Just no prompting or redirection was being taken by Stefnee." And during one visit, Stefnee called staff inappropriate names including "stupid," "cunt," and "bitch." Jasper mimicked Stefnee's words and behaviors. For example, Jasper

> would call staff stupid. He would hit . . . our glass door . . . trying to break it. He would . . . throw toys. Stefnee told us that we weren't going to end her visit after prompting her, because you are only supposed to give her so many prompts, and then Jasper would go along with her and say, no, you are not ending our visit.

- 6 -

On that visit, Shifflett ended Stefnee's visit early and called law enforcement after Stefnee would not leave the building. Shifflett testified that another visit was also ended early because Stefnee would not take redirection or prompting and instead yelled at staff, which, in turn, led to Jasper getting "worked up." Shifflett stated that on most visits, "there was more trouble than good" and that the best visits occurred where the visit was strictly playtime, like when visits occurred at the park.

According to Shiflett, although Stefnee did not get physically aggressive with Jasper during visits, she would become verbally aggressive when she was frustrated with Jasper or when Jasper failed to comply with Stefnee's requests. These incidents would scare Jasper and cause him to "shut down."

Shifflett stated that she transported Jasper to and from visits and that he was "very good" during those times but during visits

> [h]e's a totally different kid. He's a different kid when he's alone with staff. And we have seen him with [the] foster family and we have seen him with [Stefnee]. And he just acts out quite a bit with [Stefnee] versus [the] foster [family] and staff. Shifflett also observed that at the start of the case, Jasper would approach Stefnee at the start of visits for a hug or a kiss, but "the last couple of months he has not. He's distanced himself." Another issue noted by Shifflett is that Stefnee is inconsistent with her parenting and "[w]hat we see as behaviors Stefnee does not."

Shifflett explained that Stefnee failed to prompt or redirect Jasper when he talked back or told Stefnee "no" because Stefnee felt that the behavior was normal. Stefnee also failed to redirect Jasper when he jumped on office furniture. Shifflett also stated that during visits, Stefnee would be on her phone and would refuse when staff asked her to put it away. Jasper also exhibited behavioral issues such as name-calling and throwing toys, and staff discouraged Stefnee from talking "baby talk" to Jasper because he was in speech therapy.

### (c) Testimony From Mental Health Professionals

The State's witnesses included the following mental health professionals: (i) Dr. Anne Talbot, a psychologist who completed a psychological evaluation of Stefnee in October 2022 with a follow-up conducted in 2023; (ii) Joan Schwan, a licensed independent mental health practitioner who conducted a parenting assessment of Stefnee in September 2023; (iii) Lori Rodriquez-Fletcher, a licensed independent clinical social worker who completed a diagnostic interview of Jasper and a child-parent assessment (CPP) of Jasper and Stefnee; and (iv) Marcia Estrada, a mental health practitioner who conducted a co-occurring evaluation of Stefnee in October 2022 and had been Stefnee's outpatient counselor since October 2022.

#### (i) Dr. Talbot's Testimony

In October 2022, Dr. Talbot conducted a parental capacities complex psychological assessment of Stefnee. Following that assessment, Dr. Talbot diagnosed Stefnee with schizoaffective disorder, bipolar type; trauma spectrum disorder, unspecified; and found that Stefnee had features of borderline personality disorder which "is often an outcome of trauma and

usually involves an unstable personality, sense of self, emotional reactivity, [and] a difficulty with intimate relationships and self-regulation."

Dr. Talbot explained that a diagnosis of schizoaffective disorder, bipolar type, "includes the presence of schizophrenic-like symptoms, including in [Stefnee's] case paranoid delusions, as well as mood symptoms that are prominent, but may not be specific to the paranoia" which were long-term and affect an individual's overall presentation and ability to parent. Dr. Talbot testified that Stefnee's trauma spectrum disorder, unspecified, was "chronic and persistent."

In 2023, Dr. Talbot conducted an updated evaluation of Stefnee. In the updated evaluation, Dr. Talbot noted that Stefnee was participating in psychotherapy with Estrada but that Stefnee had not stabilized, was refusing to accept her diagnoses and recommendations, was refusing medication, and "was not following through with treatment recommendations to a degree that would allow her to meet that minimal parent capacity standard." Dr. Talbot noted that Stefnee displayed "fleeting patterns where she might seem focused, but she was quickly subject to dysregulation, flare-ups, and particularly if she [was] confronted, [she] . . . continued with paranoid delusions and delusions of persecution." Dr. Talbot also stated that Stefnee displayed disorganized thinking and disorganized speech, was erratic, did not pay attention to social cues, tended to "go off on rants," and it was difficult for her to return to a normal state. Dr. Talbot expressed concern that Stefnee "was at risk for easily getting into an emotionally dysregulated state where a strong emotional reactivity and chaos and disorganization will be part of the emotional environment that would affect Jasper."

Dr. Talbot further testified that she observed "the prevalence of paranoid ideations in [Stefnee's] presentation" and that Stefnee

> demonstrated a pervasive pattern of suspiciousness and mistrust of other people across a number of settings, and that appeared to be her default mode, that she was suspicious of other people, that she would also have difficulty accurately interpreting the motives and intentions of other people, and that her foundation was not to trust others and to assume that they have malevolent intentions towards her.
>
> . . . .
>
> . . . [if] a parent demonstrates that kind of emotional reactivity and assumption of malevolent intent and has over-the-top emotional reactions and goes off on what I would call rants as I observed [Stefnee] to do, that if that's persistent and she isn't able to temper those or modify those and modulate them around a three-year-old child that could put that child in jeopardy.
>
> . . . .
>
> . . . what we are talking about here is an exaggerated reaction that goes over the top and creates an atmosphere of paranoia and emotional dysregulation that is at least emotionally harmful to a child and could potentially place a child at risk, particularly if a mother, who in this case pulled a knife on someone she said was attacking her without concern for how that affected her child – that's one example.

Although Dr. Talbot cautioned that "a mental health diagnosis by itself does not predict parent capacity," after reviewing reports and other collateral information, she opined that Stefnee

"still was not meeting minimal parent capacity standards, even though it's very basic criteria, and that . . . her attitudes and emotional behavioral dysregulation continued to a degree that would pose significant emotional harm to [Jasper]."

*(ii) Schwan's Testimony*

In September 2023, Schwan performed an initial diagnostic interview (IDI), a mental status examination (MSE), and a parenting assessment. Schwan diagnosed Stefnee with borderline personality disorder and paranoid personality disorder and further identified three areas of concern: intense fits of anger, impulsivity, and unstable interpersonal relationships. Schwan testified that personality disorders "are ingrained in the personality," "don't go away," and typically get worse over time without consistent treatment. Schwan's biggest concerns related to Stefnee's borderline personality disorder were Stefnee's "intense and volatile relationships," her "extreme impulsiveness," and her "fits of anger."

Although Schwan acknowledged that a diagnosis alone does not mean that an individual cannot parent, in determining whether someone cannot effectively parent, she looked at risk factors and protective factors that are present, and bonding and attachment between the parent and child

> because even if a parent is dealing with some very severe mental health issues, if they are securely attached to their child, that increases the protective factor, and it also increases their drive to comply with the services because they are attached to their child, and that becomes their most important thing.

Schwan's identification of Stefnee's risk factors included:

> Stefnee's mental health which could result in unpredicted, agitated, and aggressive states, Jasper's need for stability and security, [and] Stefnee's low empathy and insight.
>
> And . . . there was a lack of a healthy bond between them. I saw it as an anxious-avoidant bond in Jasper. And then Stefnee not being attuned to Jasper's needs.
>
> And Jasper was young. He doesn't have any protective capacity for himself. And that the lack of [a] social support system for Stefnee . . . there is no safety net. Should Jasper go home, I even asked her . . . if something happened to you, who would care for Jasper? And that had not even occurred to her to have a safety net in place for Jasper.

Schwan testified that Stefnee's diagnosis of paranoid personality disorder affected Stefnee's ability to parent effectively and safely because

> it cuts her off from social supports if she believes people are out to get her, but . . . my concern was that she may not be able to fully participate in services if she feels like the people that are trying to help her are out to get her and out to harm her. That gets in the way of really benefiting from services.

Schwan described her observation of Stefnee and Jasper as follows:

> [T]he first thing that I saw, which is very critical, [was] to watch how they join after an absence. That tells you a lot. There was no happy greeting or even opening the door and letting him come in, like excitement to see him, and so that worried me a little bit.

And then the first comment made to Jasper was . . . How come you don't have the shoes on I gave you? Where are those? Which is a comment that a kid his age, he doesn't know where those shoes [are] – but it was more like how come you are not wearing the shoes I have given you, which along with some other things indicated that it was Jasper's duty to meet [Stefnee's] needs. And that's not healthy.

. . . .

And then . . . they did play, but the play was more parallel than parent-child play. Stefnee did get down on the floor, and she played with him. They played . . . Army men for quite a while.

Schwan noted that although Stefnee and Jasper played on the floor "for quite a while," the play theme was "aggressive in nature" with "guys getting hit and whacked and blown up." Near the end of the visit, Jasper wanted to ride his bicycle and although Stefnee asked him if he wanted to wear his kneepads and a helmet, after Jasper said "no" to wearing a helmet, she did not require him to put one on. Schwan expressed concern because, when a child is Jasper's age, there are certain things that a parent can let the child decide, but when the child's safety is at issue, the parent must enforce boundaries to protect the child. Schwan also expressed concern that Stefnee had not refilled her prescription medication because "compliance with therapy and medications is critical for long-term outcomes."

After expressing that Jasper had an anxious-avoidant attachment bond to Stefnee, Schwan described the anxious-avoidant attachment style as:

Anxious is when I don't know if you are going to meet my needs because the boundaries change all the time. . . . kids need structure and consistency so that they know every time I do this, this is going to happen.

But when the rules change all the time, kids get anxious because they don't know what they are going to get. The same as when a parent has affect regulation problems and Mom might be mad or Dad might be mad, but then the next time they are happy. The child never knows which parent they are going to get. Are they happy? Are they mad? Are they angry?

It creates . . . a lot of anxiety in kids. So that's the anxious part. . . . [sometimes] they'll kind of cling on them because they are very anxious, but then at other times they are avoidant and they push back because they are not sure what parent they are going to get.

And an anxious-avoidant attachment is probably one of the harder ones to remediate and to treat because the first step to that is getting the parent to be consistent so the child knows what parent I am going to get today.

Schwan recommended that Stefnee take part in dialectical behavior therapy (DBT), which she described as "the gold standard for borderline personality disorder." She explained that "people with borderline personality disorder tend to be very black and white" and that DBT teaches them to think that things do not have to be "black and white" and teaches them to detach their emotions from the moment and teaches skills of removing their emotions out of a situation "because that's

when a lot of the aggressive and impulsive anger happens." Schwan also noted that Stefnee had difficulty reading Jasper's cues and Stefnee looked at events from her world view and not from how events could affect Jasper.

Schwan acknowledged that Dr. Talbot diagnosed Stefnee with schizoaffective disorder whereas she diagnosed Stefnee with borderline personality disorder, but noted that

> a lot of the characteristics [of the disorders] would be the same. Schizoaffective doesn't like to be around people. They don't like to have friends.

> The one reason I did not go with schizoaffective is . . . borderlines attempt suicide, which Stefnee had done, . . . schizoafffectives don't often care what other people think of them. They are just happy to be left alone, where to me Stefnee seemed to care whatever people thought of her. Like, she's mad because other people thought I was doing this. And a schizoaffective person, that just doesn't bother them one way or the other.

Schwan declined to express an opinion regarding the termination of Stefnee's parental rights because she was unaware of what had transpired in the year since she last saw Stefnee, but she stated:

> If visits are still supervised fully at two years in foster care that would indicate an extreme lack of progress towards reunification and that there [are] still concerns remaining for why visits need to be supervised, and that would be a concern that probably reunification is not going to happen when you are two years in care and it's still fully supervised because that's not [a] good [indication] of progress.

### (iii) Rodriquez-Fletcher's Testimony

Rodriquez-Fletcher testified that she completed a child-parent assessment (CPP) with Jasper and Stefnee. Rodriquez-Fletcher testified that she started working with Jasper on May 5, 2023, during which she conducted a diagnostic interview of Jasper and then met with Stefnee for a parent-only session. Rodriquez-Fletcher began CPP treatment sessions with Jasper and Stephanie at the end of June 2023. Rodriquez-Fletcher explained that CPP

> is a dyadic-based therapy. It is geared towards working with children . . . zero to five. We have since been able to expand that to zero to six for children who have experienced trauma or some type of concerns related to attachment or safety, well-being.

> And so it has different types of goals for CPP. There [are] a lot of things we can do within the CPP realm, but a lot of it is, first of all, safety is first and foremost, and that is both emotional and physical safety as well as trying to strengthen the child-parent bond, in addition to addressing any behavioral needs and in working both to heal the child's trauma as well as there is a component of working with the parent in regards to their trauma or needs and trying to do that somewhat in a dyadic fashion.

Rodriquez-Fletcher testified that during sessions with Stefnee, Jasper displayed behaviors including jumping, hitting, and not listening. During those sessions, Rodriquez-Fletcher described Jasper as "very hyperactive," impulsive, and aggressive, but she ruled out ADHD because Jasper

did not display those same behaviors in other settings, such as school or his foster home. In those settings, she described Jasper as "very well behaved" and stated that Jasper is "almost like a different kid when he's with Stefnee versus when he's not around her." Rodriquez-Fletcher testified that she ended CPP in January 2024 because Stefnee was struggling with her mental health, her overall stability, and lack of overall progress. Rodriquez-Fletcher testified that Stefnee was inconsistent, which was "causing more harm to Jasper than with continuing." Due to Stefnee's overall lack of progress, Rodriquez-Fletcher stated that she

> needed to shift and go in a different direction to be able to meet Jasper's needs, for his own mental health and to be able to . . . help him . . . work through some of his trauma because Stefnee had a hard time holding some of that for him.

Rodriquez-Fletcher noted concerns that Jasper would become disruptive and anxious and would often display aggressive or regressive behaviors. Other times, Jasper would fight with Stefnee, become aggressive towards her, or say hurtful things like, "I just want to be done and go to my new family." If Stefnee protested that the foster family was not Jasper's family, he would say things like, "They are my family; you are not my family anymore."

Rodriquez-Fletcher testified that despite ending CPP, she was still working with the family at the time of the termination hearing. She stated that she "shifted. . . more towards some individual therapy for [Jasper], doing some individual play therapy and some trauma-focused cognitive behavioral therapy types of things. And then I have provided some parent-only sessions with Stefnee . . . ."

In the parent-only sessions with Stefnee, Rodriquez-Fletcher focused on addressing concerns regarding Stefnee's overall mental health, stability, acceptance of feedback, and appropriate insight. Rodriquez-Fletcher explained that Stefnee was "often preoccupied" and "she just got into a lot of complaining, kind of badmouthing people that were associated with the case and that sort of thing." Rodriquez-Fletcher also reviewed visitation notes, talked with Stefnee about her visitations, and provided feedback to help Stefnee be more consistent, develop a routine, read Jasper's cues and follow through with meeting Jasper's needs, and provide ways to help the visits go more smoothly.

Rodriquez-Fletcher was concerned about Stefnee's patterns of behavior or patterns of thinking, including Stefnee's preoccupation with certain things to the level of obsession; her paranoia; her irritability; her high level of agitation; talking to herself, her deceased mother, or the "Hulk"; and laughing during times when there was nothing to laugh at. These behaviors were consistent with Stefnee's diagnoses. Rodriquez-Fletcher testified about one telehealth session with Stefnee during which she had to disconnect because Stefnee was agitated, yelling, swearing, and could not be redirected.

Rodriquez-Fletcher testified that Stefnee had "significant mental health concerns" that impacted her ability to parent; that Stefnee's mental health issues impacted Jasper; and that Stefnee either did not want to, or could not, manage her symptoms. And, although Rodriquez-Fletcher discussed various options with Stefnee including medications and therapy, Stefnee struggled with consistency and follow-through, especially regarding medications. Stefnee also struggled with appropriate boundaries and would "routinely call, message, [and] e-mail [Rodriquez-Fletcher] at

various hours of the day and night" and struggled to manage herself and remain calm during meetings.

Rodriquez-Fletcher's CPP assessment noted concerns with Stefnee and Jasper's attachment as

> not being a safe, secure attachment and that I felt that there was an anxious disorganized attachment.
>
> I think there is . . . some overlapping with that where there is a little bit of avoidant, a little bit of anxious and fear base, and then there is also this kind of disorganized where you kind of see this push and pull type of response.
>
> Like, Jasper loves her definitely, and Stefnee loves Jasper. I don't have any questions about that. But there is this hypervigilance about him in regards to her of almost, I think, trying to figure out how she's going to be. Like is she going to be calm and okay today or is this not going to be that way.
>
> And so you would definitely see [Jasper's] anxiety, his acting out, his hyperactivity during those times. And . . . even now this shift of, like, you are my mom and I am supposed to want to be with you, but I like . . . where I am at.
>
> And . . . the longer I have worked with [Jasper] individually too you really see his shift in this is not typical or how families kind of are, and so especially as they have had another foster child who went home and was able to reunify. And so he had a lot of questions about that.

Rodriquez-Fletcher opined that some of Jasper's confusion stems from his love for Stefnee and his love for his foster family. She stated that Jasper

> calls [his foster parents] Mom and Dad. He's very . . . happy to see them and . . . I think that it gets confusing when, to him, that is his home and his family. He's been out of the home a very long time. He refers to the foster home as his home. He refers to them as Mom and Dad and his parents.
>
> But then when you have Stefnee [saying] that's not your home . . . you love me; right? You want to be with me. You want to come home with me.
>
> Then I think he struggles because what else is he supposed to tell her? He wants to please [Stefnee] and make her happy, but he also struggles with I am not sure . . . what I really want or need. And so . . . I definitely have seen that.
>
> I think also with him . . . I have seen him be angry and aggressive towards Stefnee or towards just things like in the office . . . with the toys and that sort of stuff, but then you see him with the foster family, such as I have seen, or just in my individual sessions, and he's not like that at all. He's very calm. He follows the rules. He sits. He's not jumping and bouncing. He's not jumping on the couch. He's not jumping on anybody.

Although Rodriquez-Fletcher declined to opine on whether termination of Stefnee's parental rights was in Jasper's best interests, she stated that "I think there are times that [Jasper] has received positive things from [Stefnee]. It's just not consistent, and it brings him a lot of anxiety." According to Rodriquez-Fletcher, despite Stefnee's "significant mental health issues,"

she has the capacity to parent "but for whatever reason she's not doing the things she needs to do to make the progress she needs to make," which was evidenced by the lack of overall progress and/or regression, displayed throughout the case. Rodriquez-Fletcher explained that Jasper had trauma related both to his removal and his exposure to Stefnee's chronic mental health concerns.

Rodriquez-Fletcher testified that she did not dispute that Jasper and Stefnee love each other but "[t]he concern is that whether [Stefnee] can appropriately take care [of him] and parent him." She further testified that "most of the time Stefnee has been unreasonable," which she has displayed with multiple family support workers, multiple agencies, and the GAL. Rodriquez-Fletcher stated that "Stefnee blames everybody else but taking any ownership herself."

And when asked her opinion on whether Stefnee could safely parent Jasper emotionally, Rodriquez-Fletcher stated:

> . . . there [are] two sides to Stefnee. I think there are times when her mental health interferes and she's not able to do that. I think there are other times when she does have the capacity and just is so angry and hostile that she's not able to do that.
>
> As far as overall capacity . . . I don't think it's because of her cognitive capacity that she's not able to provide this. It's just oftentimes Stefnee gets in her own way, and that causes concerns not just for [Jasper's] emotional safety, but even his physical safety.

### (iv) Estrada's Testimony

Estrada testified that she has been Stefnee's outpatient counselor since October 2022. At the outset of counseling, Estrada conducted a pretreatment assessment of Stefnee after which she diagnosed Stefnee with post-traumatic stress disorder, bipolar disorder with psychotic features, and personality disorder. Estrada explained that bipolar with psychotic features is "where you have the ups and downs, the mood swings. Sometimes those moods are very depressed and down and other times they are very elevated, but that elevation or mania can come out in irritability. It just depends on the person and how they handle things."

Estrada testified that Stefnee's diagnosis of personality disorder was based upon her interactions with Stefnee and included that "Stefnee was in the foster care system. She was adopted. Lots of trauma after her [adoption], things like that. So inconsistent parenting and authority figures that crossed boundaries." She described that persons with personality disorder will often "set up walls and push people away. They will say things to keep them at a distance, but then they want people around them. So it's very hard for them to regulate sometimes their emotions. And it is with the bipolar disorder too." She also stated that persons with a personality disorder diagnosis will often have difficulty making connections with others or, alternatively, will develop connections too quickly.

Estrada also explained that PTSD impacts Stefnee in that "[s]he is suspicious, hypervigilant, . . . waiting for the next person to screw her over, . . . being angry, [and] not trusting folks a lot." Estrada stated that Stefnee keeps in contact with her daily via text and that Stefnee often needs time to process after their sessions noting that "[i]t takes her a while to think about things and . . . work it through in her mind. If she's stressed or anxious, she will shut down sometimes, or she will react very loudly and defensively. . . making accusations towards people."

Estrada further testified that Stefnee does not trust others easily, "[e]specially people involved in the system and especially people involved with her current CPS case."

Following the initial intake, Estrada developed a treatment plan for Stefnee including weekly sessions which entailed "[s]tabilizing her mental health, which included getting on medications, working on some rational thinking and processing information before she reacts. That is going to be a long-term thing . . . chang[ing] a personality is difficult . . . as an adult." Estrada testified that Stefnee's attendance for her sessions was very good. The modality of therapy that Estrada uses with Stefnee is "[a] lot of solution focused, let's look at what you are doing, what is the problem, how are we going to solve this problem, how are we going to move forward. And then I do some rational motive, which is the direct, blunt approach, telling her to shape up and listen and quit being stupid." During sessions, Estrada worked with Stefnee on parenting skills and coping mechanisms including music and writing poetry. Estrada stated that the modalities that she uses are effective "[f]or the most part" and that Stefnee made progress. However, Stefnee distrusted the workers assigned to her case and the longer the case has drawn out, her depression, stress, and anxiety increased, causing Stefnee to talk about "giving up" and stating that "they are going to take [Jasper] away no matter what I do, no matter what I say . . . she feels the [family support workers] are extremely critical of her."

Estrada further testified that Stefnee is medication compliant approximately 80 percent to 90 percent of the time and the times that she does not take her medication is because she forgets, not because she does not want to take it.

Estrada described Stefnee as "very intelligent" but stated that others might perceive Stefnee as "rude," "a know-it-all," and "maybe noncaring." She also described Stefnee as "a very strong personality. As she puts it . . . mama bear comes out when she's around Jasper or thinking about Jasper" and based upon Stefnee's description, the August 2022 incident "took place because she thought Jasper could potentially be . . . at risk." Stefnee eventually understood that her actions during the August 2022 incident are the reason that Jasper was removed but "[i]n her mind, she was defending Jasper. And . . . she apparently took a knife out, but never pulled the blade out, but then put it back in her pocket."

Stefnee expressed frustration and confusion about the parenting advice she received from family support workers, claiming "[t]hat they'll tell her one thing . . . on this visit and then the next time they tell her something else. One [family support worker] would be very strict about things and then the other one would say it's all right. So she gets very confused by those messages too."

### (d) Witnesses For Stefnee

Witnesses for Stefnee included herself; Anne Cerrato-Young, a psychiatric mental health nurse practitioner who provided medication management to Stefnee; and Crystal Williamson, Stefnee's neighbor.

### *(i) Stefnee's Testimony*

Stefnee testified that, prior to DHHS' involvement, she was Jasper's sole caregiver, and she paid for her and Jasper's needs through her disability payments, her work, and food stamps. She also attended college, obtained her certified nursing assistant certification, was currently

employed as an in-home care provider, and she had passed a background check to obtain that employment.

Prior to DHHS' involvement, she and Jasper had scheduled times for meals. Jasper attended daycare during the hours that Stefnee was working or taking classes. Stefnee took Jasper on outings to the park, museums, fishing, camping, and swimming, and at home she read picture books to Jasper, and they did sensory activities. Jasper also had a star chart where he could earn stars for doing chores and good behavior and based upon how many stars Jasper earned, he would get an allowance to spend on what he wanted. When Jasper needed to be disciplined for bad behavior, Stefnee would not give him a star for his star chart.

Stefnee stated that Jasper's first reaction upon seeing her during visits was that he was excited, happy, and he would run to her to give her a hug and that he "hated when visits ended." She further stated that Jasper still tells her that he wants to come home. Stefnee described Jasper as "[a] very happy, hyper, bright-eyed, bushy-tailed, go-lucky kid."

Stefnee further alleged that visitation was frequently scheduled during her work shifts which required her to leave her job. Despite Stefnee's requests, DHHS has not granted her any additional time with Jasper.

### (ii) Cerrato-Young's Testimony

Cerrato-Young testified that she provided mental health medication management to Stefnee for 2 years and diagnosed her with generalized anxiety, posttraumatic stress, mood and affect disturbances, and insomnia due to her mental health. She testified that they met approximately every 6 weeks and Stefnee reported that she was "feeling fine, stable, is able to work through her emotions, not having irritability that's . . . out of the ordinary, is able to manage her anxiety well. So . . . she presents [as] stable." Cerrato-Young testified that Stefnee had been medication compliant for the last 1½ years and that if Stefnee did not take her medications, she could present with increased anxiety, mood instability, and irritability.

### (iii) Crystal Williamson's Testimony

Williamson testified that she observed the incident where the family support worker terminated one of Stefnee's visits because Stefnee was allegedly standing too close to the family support worker's car. Williamson stated that Stefnee "was sitting on the curb calm, not doing anything. And the support worker was in the truck refusing to open the door." According to Williamson, the family support worker yelled that she was terminating the visit because Stefnee was standing too close to the car.

Williamson also testified to an incident in which she observed two family support workers outside of Stefnee's home, where she heard one of the support workers say "I already did my report for this crazy bitch . . . If you want, I will let you see it so they match up."

### 8. COUNTY COURT'S ORDER

On October 31, 2024, the county court found that the GAL and State had adduced clear and convincing evidence supporting termination of Stefnee's parental rights pursuant to § 43- 292(2), (5), (6), and (7) and that termination was in Jasper's best interests. The court found

- 16 -

that the GAL and State had not adduced clear and convincing evidence supporting termination of Stefnee's parental rights pursuant to § 43-292(3).

## III. ASSIGNMENTS OF ERROR

Stefnee contends that the court abused its discretion in: (1) terminating her parental rights pursuant to § 43-292(2), (5), (6), and (7); and (2) finding that termination was in Jasper's best interests.

Stefnee also assigned as error that the juvenile court erred in admitting testimony that violated her due process rights. However, Stefnee failed to argue this assigned error in her brief. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *In re Interest of Joezia P.*, 30 Neb. App. 281, 968 N.W.2d 101 (2021). Accordingly, we do not review her assigned error related to the admission of testimony.

## IV. STANDARD OF REVIEW

Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings. *In re Interest of Noah C.*, 306 Neb. 359, 945 N.W.2d 143 (2020). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other. *Id.*

## V. ANALYSIS

### 1. STATUTORY BASIS FOR TERMINATION OF PARENTAL RIGHTS

Stefnee's first assignment of error is that the court erred in terminating her parental rights pursuant to § 43-292(2), (5), (6), and (7).

To terminate parental rights, it is the State's burden to show by clear and convincing evidence both that one of the statutory bases enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Cameron L. & David L.*, 32 Neb. App. 578, 3 N.W.3d 376 (2024).

We first address whether the court erred in terminating Stefnee's parental rights pursuant to § 43-292(7). Section 43-292(7) allows for termination when the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). It operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *Id.* In a case of termination of parental rights based on § 43-292(7), the protection afforded the rights of the parent comes in the best interests step of the analysis. *Id.* And, as the Nebraska Supreme Court recently clarified in *In re Interest of Jessalina M.*, 315 Neb. 535, 997 N.W.2d 778 (2023), the trigger date for determining the look back period for grounds under § 43-292(7) is the date that the petition for termination of parental rights is filed.

In the present case, the evidence established that Jasper was placed in the care and custody of DHHS on August 12, 2022, and remained in out-of-home placement during the pendency of the case. At the time the petition to terminate Stefnee's parental rights was filed on July 18, 2024,

Jasper had continuously been in out-of-home placement for approximately 23 months, which is well beyond the 15-month time period set forth in § 43-292(7). Because Jasper has been in out-of-home placement for 15 or more months of the most recent 22 months, we find that the court did not err in finding that statutory grounds existed for termination of Stefnee's parental rights under § 43-292(7).

Having determined that statutory grounds existed for termination of Stefnee's parental rights under § 43-292(7), we need not further address the sufficiency of the evidence to support termination under any other statutory ground. See *In re Interest of Becka P. et al.*, *supra* (if appellate court determines that lower court correctly found termination of parental rights is appropriate under one of statutory grounds set forth in § 43-292, appellate court need not further address sufficiency of evidence to support termination under any other statutory ground).

## 2. BEST INTERESTS

Stefnee's second assignment of error is that the juvenile court erred in finding that termination of her parental rights was in Jasper's best interests.

In addition to proving at least one statutory ground, the State must show that termination is in the best interests of the child. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *Id.* There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id.*

The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the child's best interests. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's well-being. *Id.* The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id.*

Termination of parental rights is a final and complete severance of the child from the parent and removes the entire bundle of parental rights. *In re Interest of Destiny H. et al.*, 30 Neb. App. 885, 974 N.W.2d 343 (2022). Therefore, with such severe and final consequences, parental rights should be terminated only in the absence of any reasonable alternative and as the last resort. *Id.* The law does not require perfection of a parent. *Id.* Instead, we should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *Id.* Whereas statutory grounds are based on a parent's past conduct, the best interests inquiry focuses on the future well-being of the child. *Id.*

As we stated before, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in childrearing and which caused or probably will result in detriment to the child's well-being. Here, the record clearly and convincingly demonstrates that Stefnee suffers from mental health

conditions which, because she was unable to manage them, made her an unfit parent. Dr. Talbot diagnosed Stefnee with schizoaffective disorder, bipolar type; trauma spectrum disorder, unspecified, and found that Stefnee had features of borderline personality disorder; Estrada diagnosed Stefnee with PTSD, bipolar disorder with psychotic features, and personality disorder; and Schwan diagnosed Stefnee with borderline personality disorder, paranoid personality disorder, and identified intense fits of anger, impulsivity, and unstable interpersonal relationships as areas of concern. Although these diagnoses differed, the diagnoses shared common features such as having an unstable personality, emotional dysregulation, difficulty with intimate relationships, paranoia, distrust of others, impulsivity, mood swings, and fits of anger.

As Dr. Talbot explained, Stefnee's mental health conditions placed Stefnee at constant risk of emotional dysregulation with resulting reactivity, chaos, and disorganization. Dr. Talbot further opined that these conditions placed Jasper in jeopardy and posed a significant risk of emotional harm to him. And although Stefnee's diagnoses differed to some extent, all such mental health providers opined that Stefnee suffered from significant mental health conditions which created a risk of harm to Jasper. Notably, the characteristics that the medical experts described as associated with Stefnee's conditions were observed by the agencies that attempted to assist her. Those agencies that attempted to provide supervisory services and assist Stefnee with reunification were rejected by her and became the target of her aggressive mood swings and expressions of hypervigilant behavior and distrust. And although the same experts believed Stefnee could effectively parent with proper medication control and therapy, she has not made progress with reunification despite Cerrato-Young's testimony that Stefnee had been medication compliant for the last 1½ years.

The risk to Jasper was demonstrated at the outset of these proceedings. Jasper was first removed due to Stefnee brandishing a knife at Jasper's 17-year-old babysitter over an apparent fee dispute. And Stefnee continued to demonstrate wild mood swings when confronted with DHHS personnel whose roles were designed to assist her. In short, even though DHHS has consistently provided Stefnee with services since August 12, 2022, Stefnee is no closer to reunification than the day that Jasper was initially removed. Due to Stefnee's erratic behaviors, multiple agencies refused to continue to supervise visits, and visitation was reduced to 4 hours per week and remained supervised. And Stefnee's mental health providers stated that Stefnee is apparently either unable or unwilling to modify her behaviors.

There is no question that Stefnee loves Jasper and desires to reunify with him. But the record indicates that Stefnee's unmanaged health conditions interfere with her ability to engage in a course of treatment which could eventually result in a reunification and her current conditions, without medical assistance, place Jasper at risk of harm.

When a parent is unable or unwilling to rehabilitate himself or herself within a reasonable period of time, the child's best interests require termination of parental rights. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015).

On this record, we find by clear and convincing evidence that Stefnee is an unfit parent and that termination of Stefnee's parental rights is in the child's best interests.

## VI. CONCLUSION

Because we find that statutory grounds for termination existed and that the evidence was sufficient to support the court's finding that termination was in the best interests of the child, we affirm.

AFFIRMED.